JUNE TERM, 1855.                    39

Marine Ruffner, who sues, etc., v. Commissioners of Hamilton County, et al.

MARINE RUFFNER, who sues, etc., v. COMMISSIONERS OF HAM-
ILTON COUNTY, et al.

1. The local act of February 24, 1848, "relating to the duties and powers
   of the county commissioners of Hamilton county," was not repealed by
   express terms, or by implication of the general law of March 12, 1853,
   "establishing boards of county commissioners, and prescribing their
   duties;" nor is such local legislation inconsistent with the provisions of
   the new constitution.
2. Building contracts are void, and can not be sustained where entered into,
   by a majority of the county commissioners, in contravention of the 3d
   section of the local act of 1848, prohibiting the commissioners from
   entering into any contract for the erection of a public building, involving
   an expenditure of more than $5,000 of the public funds, without first
   submitting the question to, and receiving the approval, of a majority of
   the qualified electors of the county.
3. In such case an injunction will lie to prevent further proceedings under
   such contract.
4. Where two affirmative statutes exist, one is not construed to repeal the
   other by implication, unless they can be reconciled, by no mode of inter-
   pretation.

SPECIAL TERM.—Application for an injunction to restrain
John F. Miller and John Patton, two of the commissioners
of Hamilton county, and John Hawkins, builder, from all
proceedings under a pretended contract, made by Miller and
Patton, as commissioners, of the one part, with Hawkins, as
builder, of the other part, for the erection of an insane
asylum, near Carthage, in Hamilton county. The petition
alleges that the plaintiff is a tax-payer of the county, and
also one of the three members of the board of county com-
missioners, and that he sues for himself, as well as other tax-
payers of the county, who are too numerous to be made
parties; that the plaintiff knew nothing of this contract,
and that he had entered his protest against its execution as
illegal and fraudulent; that the contract is indefinite as to
the amount of brick to be furnished, and as to the time when
to be done; that notice of the intention to contract was not
given; that the price agreed to be given was exorbitant;

that other persons are ready and willing to do the work at a less price, and that thereby there will be a loss of ten thousand dollars to the tax-payers; that it involves an expenditure greater than five thousand dollars; and that the question of such an outlay has not been submitted to the approval of the qualified electors of the county.

*Walker, Kebler & Force,* for plaintiff.

*Worthington & Matthews,* and *J. B. Warren,* for defendants.

STORER, J.  The plaintiff claims to be a tax-payer of Hamilton county, and as such to be directly interested in the action of the defendants, whose proceeding, as described in his petition, will necessarily cause to be levied upon his property a tax to discharge the pretended obligations they have assumed.

The substance of the petition is, that two of the defendants, who are a majority of the commissioners of Hamilton county, have contracted, as they allege, with divers persons to construct a building, to be appropriated for an infirmary and lunatic asylum; that the construction involves a larger expense than five thousand dollars.  The contracts were made without the submission of the question, whether the expenditure should be made, to a vote of the electors of the county, as required by law.  It is also averred that the contracts were entered into without proposals for estimates being invited from others; that no competition has been permitted among those who would otherwise have solicited the work, but the same has been allotted to individuals at high prices, and greatly beyond the fair value.

The defendants answer, denying the fact that the contracts entered into are at prices beyond the fair value of the work to be done.  They admit that no proposals were sought to ascertain the value of the work, and that no vote was taken by the electors of the county to authorize the expenditure. All the other allegations of the petition are substantially admitted.

The application has been argued to me on the question as to the necessity of the approval by the electors .of the expenditure proposed, before the contracts could be made. The other question, involving the power of the commissioners to act until proposals had been invited, has been already determined by one of my colleagues, who has determined upon the cases presented, and upon the facts as there stated, to deny the application for a restraining order, regarding the point as depending mainly upon the discretion of the commissioners, and as no abuse of that discretion is averred, none can be presumed. With this ruling I coincide, reserving, however, until fuller argument, upon final hearing, the benefit of any doubt I may have as to the propriety of granting the relief sought by the petition, when the question may be more elaborately discussed, and all the facts connected with it more minutely set forth and proved.

The other point, however, already stated, was not presented on the former hearing, and is now before the court for the first time. The whole argument in favor of the proposition is based upon the 3d section of the law of 1848, passed February 24; see Local Statutes, vol. 46, 267. We have already said the requisition .of this section has not been observed, and it is now our duty to inquire, if it was in force at the time the contracts were made.

On the part of the defendants, it is claimed that the law embodying this section is inconsistent with the act establishing boards of county commissioners, and prescribing their duties; see law of March 12, 1853—Swan 180, §11.

It will be readily perceived that this act does not repeal the law of February, 1848, by name, nor does it seem to us that it repeals it by necessary implication. Whenever the latter rule is relied on, it must be when a clear case for its application is presented, and as implied repeals are never favored, there should be no reasonable doubt of the intention of the legislature when it is sought to be enforced. 10 Ohio 173, 178, *Dodge* v. *Gridley.* As was said in this case: "When two affirmative statutes exist, one is not construed to repeal

the other by implication, unless they can be reconciled by no mode of interpretation." See also 2 Wash. 381, *Warder* v. *Arell;* 9 Cowan, 437, *McCartee* v. *Orphan Asylum, etc.;* and the very able note in the introduction to 1 Curwen's Revised Statutes, where the principle is fully discussed, and the authorities quoted.

When the law of 1848 was enacted, the law of 1831, March 3, was, and still is, in force; Swan 758. Although by the latter statute the power was very fully vested in the commissioners to erect public buildings, it was nevertheless restrained by the law of 1848. This restraint, it is not claimed, was then unconstitutional, or inconsistent with the proper exercise of the powers already conferred on the commissioners.

It may well apply, it is not denied, to the laws of 1831, but it is claimed it can not control that of 1853, as section 26 of the 2d article of the constitution forbids all *general legislation,* unless it is uniform in its operation throughout the State. As, then, the law of 1853 was a general law; its operation must be uniform, and not restrained by any legislation that would modify its powers in any one locality more than another.

In other words, it is contended that the legislature, when a general law is once enacted, have no power to control the manner of its operation—it must act precisely the same in every county, not merely as to the object it proposes to attain, or accomplish, but the same minute details that are connected with its machinery in one portion of the State, must be arbitrarily followed everywhere. The position thus assumed covers the whole power of the legislature in the enactment of laws, and it is our duty, therefore, to ascertain what is meant by the language of the clause in the constitution referred to; to learn how far it limits the law-making power, and deprives the legislature of the right to restrict, as occasion may require, the acts of public officers.

We suppose no new limitation was introduced into the new constitution, by the clause alluded to, that did not attach, by fair legal construction to the old. The principle asserted, we

believe, was always held by the courts, and was a part of the jurisprudence of the country. No laws, professing to be of general utility, imposing burdens for the common benefit, or affecting the property or privileges of individuals, could have been held valid, if distinctions should be made in the manner of their execution, in the amount of duty required to be performed, or the burdens to be borne. When the system is introduced, or a rule affirmed, they must both affect all, and operate equally upon all.

Such has been the character of all our general laws, where the principles we have alluded to have been embodied, or sought to be sustained. Our criminal code—our whole remedial system of laws—our practice acts—our laws imposing taxes—have had in view a uniform operation, yet, from time to time, it has been deemed expedient to define the limits of criminal jurisdiction, and furnish to the local authorities of particular cities, towns, and villages, the means to protect themselves, by special legislation, operating alike within the territory upon the resident, as well as the stranger, producing, as a necessary result, great irregularity in the burdens imposed, as well as the restraint of private right. And thus it is that new legal remedies are given, when the necessity is obvious, from the peculiar condition of commerce, agriculture, or manufactures, requiring a new exercise of legislative power to protect those great interests—and hence the statute authorizing the seizure of water-craft, the law protecting wild animals from the hunter at certain times of the year, and that which has heretofore exempted, from the usual burdens of taxation, the machinery of the manufacturer; thus practically conferring advantages upon particular sections of the country, as many—perhaps the largest portion—must necessarily be without the benefit of such legislation.

Our tax system, though intended to be general, has discriminated in the object to be taxed; though the amount to be levied is nominally the same upon all property, yet the mode of assessment, the values ascertained, and the propor-

tions to be fairly borne by the tax-payer, are often unequally, if not arbitrarily, levied.

Since the organization of our State government, the power to enact local laws, operating in some measure in restriction or modification of the general statute, has been assumed by the legislature, acquiesced in by the people of the State, and never judicially denied by the courts.

We have but to look through the volumes that contain the legislation of the last fifty years, to find the fullest vindication of the power referred to, in the numerous private acts that trenched, not only on the general laws, but frequently assumed the character of judicial interpretation; and these were not peculiar to our own State. The statute books of every State legislature exhibit similar assumptions of power, that have been held not only justified by some particular exigency, but were the salutary exercise of legislative discretion; thus maintaining the sanctity of the law, by so guarding its administration that the public functionary may have not only no temptation to do wrong, but as the very condition of holding his office, shall be required to yield his private interest to that of his constituents.

We have said that the rule requiring all general laws to be uniform, is but the exposition of the law, as always administered by the courts, and its practical application has never, we believe, been doubted, though so often made the subject of special legislation.

The constitution of the United States empowers Congress to pass an uniform system of bankrupt laws, and to provide also for a uniform system of naturalization; and yet a bankrupt law has been made to operate upon one class of persons to the exclusion of another; and though the mode of naturalization has been prescribed—the material part, the fees of the officers performing the service, are left to the regulation of the several States; and thus the right of citizenship in Ohio may cost but a small pittance, while in another State the fees may be exorbitant.

We are led, therefore, to believe that the language of our

present constitution is not more restrictive than the rule existing anterior to its adoption, by which its powers were construed and regulated.

When we refer to the action of the legislature since the new constitution, we find the same right of which we have spoken has still been claimed, and very distinctly asserted. The members of the Assembly were, many of them, recently from the Constitutional Convention, and must be supposed to have understood the object and meaning of the instrument they had assisted in framing, and by which their powers of legislation must have been controlled.

: They gave, then, a construction to the constitution, which, being cotemporaneous with its formation, is entitled to great weight in deciding what should be our opinion on the same subject.

3 Ohio, 553, 555, *Heirs of Ludlow* v. *Johnson;* per Hitchcock, J.; 1 Cranch, 299, *Stuart* v. *Laird;* 1 Wheaton, 304, *Martin* v. *Hunter;* 6 Wheaton, 264, *Cohens* v. *Commonwealth of Virginia;* 27 Maine, 9, *Myrick* v. *Hasey.*

Thus, on the 20th of April, 1852, Local Laws, vol. 50, p. 3, a statute was passed distinctly increasing the powers of the commissioners of Hamilton county, and though it was in "*pari materia*" practically, with the law of 1848, yet it does not repeal it directly, or by implication; vol. 50, p. 10, a special law to remove the county-seat of Lucas; vol. 50, p. 9, a special law relative to jurors and clerks, applicable only to Hamilton county; vol. 50, p. 10, establishing township election precincts, when there was a general law on the subject; vol. 50, p. 12, admitting candidates to examination and to practice law who are not citizens of the United States; vol. 50, p. 19, for support of a certain school district; and in the legislature of 1853–54, vol. 51, pp. 530, 534, 538, 539, 540; and last of all, the law authorizing the commissioners of Hamilton county to purchase land for a work-house, under which the jail property has been purchased, vol. 52, pp. 165, 166, 167, 168, 171, and *passim* to p. 184.

We think that we may well conclude that the power to enact local laws, of the description to which we have referred, in any proper case, has been properly assumed by the legislature.

The law of 1848, as we have already intimated, has not been repealed in express terms, and that it is regarded to be still in force, we find it republished by Swan, p. 181. This late compilation of the statutes has been approved by the legislature, and a large number of volumes purchased for distribution, as the authoritative version of the laws now in operation.

With all these facts before us, we can not hold that the law of 1848 has been repealed, or that it is inconsistent with any of the clauses of the constitution relied on by the defendants' counsel. The object of that law was such that it strongly appealed to the legislative discretion; the limitation of power it intended to impose was just and appropriate; the restraint upon its exercise, except by the consent of the tax-payers, was but the protection which those tax-payers had the right to ask from those who alone could impart it. It is, after all, but the denial to the public servants of the right to expend the public treasure, without the consent of those who must ultimately meet the expenditure. Before the burden is imposed, it is but just that the willingness of the electors to bear it should be manifested in an intelligent and unmistakeable manner.

An argument, drawn from the last clause of section 26, article 2, of the constitution, has been urged, but we do not feel its pressure. The law of 1853 took effect from the date of its passage, but a portion of the expenditure it would otherwise authorize to be made is forbidden by the law of 1848, then in force, unless the tax-payers consent. The limitation does not affect the validity of the law—it merely prevents the expenditure of money, beyond a definite amount, until the assent of the electors has been had. It is as if the law of 1848 was incorporated into the law of 1853, and I do not perceive how such provision can be held to be unconstitutional.

The question presented, we feel is a very grave one; but after a careful examination in all its aspects, our conviction is that the law of 1848 is in force, and the contracts entered into by the commissioners can not be sustained on legal principles. If there is no power to authorize their execution, the parties in interest can claim nothing from the county— the contracts are simply void, as the statute expressly declares they shall be, if its provisions are not complied with; and all payments made upon such contracts, whether part performed or not, come within the same rule.

The right of the plaintiff to sue was not argued at the hearing of this motion, though it was very fully before my colleague on the former application. I have no doubt of the right of any tax-payer, who will be compelled to pay a portion of the amount of the proposed expenditure, to ask relief from any act of the county commissioners, which will, against law, require them to assess his property to discharge their expenditure.

2 Mylne & Craig, 129, 613; 8 Simons, 193, 272; 6 Johns. Ch., 439; Story's Eq., §934; 5 Porter's Ind., 39; 2 Bligh N. R., 312; 3 Coms., 430; 4 Mylne & Craig, 17; 2 Duer, 618, 663; 1 Duer, 453, 98; 13 How. U. S. 566, 76, 608; 5 Porter, Ala. 279.

The allegations in the petition should, I think, be more specific. It should appear that the plaintiff was a tax-payer, liable to be assessed for the payment of these contracts. These amendments, and any others, that either party may wish to make, may be made, so that the case can be fully heard and determined when the questions are finally argued at bar.

We have been reminded that the immediate construction of an infirmary and lunatic asylum depend upon the prompt execution of these contracts, and very eloquent appeals have been made in behalf of the afflicted class of our fellow-men, who will become the inmates of the institution. Our sympathies have been touched, and we willingly adopt the sentiment of counsel, so nobly uttered, that the necessities of the

decrepid and insane demand, at the hands of our public functionaries, the most speedy action. But we must administer the law as we find it, and be just, as well as merciful. There can be no certainty in legal decisions, if the great principles, by which courts must at last determine their judgment, are disregarded, or molded to suit the particular case.

To uphold our legislative and judicial systems—sustaining the one by the proper administration of the other—is the ultimate object of the law. We can only truly indicate the spirit and the purpose of constitutional government, when we hold every minister of the law to the full and honest discharge of his duties.

The order will be granted in each case—the undertaking to be entered into in $3,000.

Injunction ordered.